**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK DIMONDSTEIN, an individual<br>　　1640 16th Street NW, Suite 504<br>　　Washington, DC 20009,<br><br>　　　　　　Plaintiff,<br><br>　　　　vs.<br><br>JERRY STIDMAN, an individual<br>　　6847 N. Wahoo Tree Street<br>　　Terre Haute, IN 47805,<br><br>　And<br><br>JONATHAN KELLEY, an individual<br>　　1245 N. Westfield<br>　　Oshkosh, WI 54902,<br><br>　　　　　　Defendants. | Civil Action No.:<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DEFAMATION**

**I.     INTRODUCTION**

Plaintiff Mark Dimondstein ("Dimondstein" or "Plaintiff") brings this Complaint for defamation against Jerry Stidman ("Stidman") and Jonathan Kelley ("Kelley") (collectively, "Defendants") and the states the following:

**II.    JURISDICTION AND VENUE**

1.     This Court enjoys original jurisdiction over the subject matter of this action under 28 U.S.C. § 1332, in that it is a civil action between citizens of different states in which the matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

1

2. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants conduct was targeted to cause injury in this District such that a substantial part of the events or omissions giving rise to this claim occurred here.

## III. PARTIES

3. Plaintiff, Mark Dimondstein, is, and at all times mentioned herein was, a citizen of the District of Columbia, residing in the District of Columbia.

4. Defendant, Jerry Stidman is, and at all times mentioned herein was, a citizen of Indiana, residing in Vigo County.

5. Defendant, Jonathan Kelley is, and at all times mentioned herein was, a citizen of Wisconsin, residing in Winnebago County.

## IV. FACTS

### Dimondstein's Role as APWU President and Re-election Campaign

6. Dimondstein is the President of the American Postal Workers Union (the "APWU"), which is headquartered in Washington, DC.  All resident officers of the APWU are required to maintain their full-time work in the Washington, DC office.

7. The APWU represents approximately 200,000 employees of the U.S. Postal Service and approximately 1,600 employees in the private-sector mailing industry.

8. As the APWU's top officer, Dimondstein is responsible for all operations of the national union and oversees a budget of tens of millions of dollars.  He also oversees the activities conducted by the offices and staff of every department, division, and committee defined by the APWU Constitution.

9. Dimondstein is the editor of the APWU's bimonthly magazine and is the spokesperson on all contractual and legislative matters of concern to the union.

10.     Dimondstein began his first three-year term in November 2013 and was re-elected to another term in 2016 with an overwhelming majority (84%) of the votes cast.

11.     Before being elected as President of the APWU, Dimondstein held a variety of positions for the APWU, including as President of the Greater Greensboro Area Local for 12 years and as National Lead Field Organizer for 10 years.

12.     Today, Dimondstein is running for re-election as President of the APWU, seeking his third consecutive term.

**Stidman's Opposition to Dimondstein**

13.     Stidman is an activist member of the APWU.  In 2016, he made an unsuccessful run against Dimondstein for the position of APWU President, receiving 16% or less of the total votes cast.

14.     Soon after the 2013 election, Stidman began to regularly articulate his opposition to Dimondstein and his entire administration on various blogs and social media.   His attacks are frequently disparaging and often misleading.

15.     Stidman is known throughout the APWU as being a strong critic of Dimondstein and an active supporter of one of Dimondstein's current opponents for President, unofficially involved in his campaign.

16.     Stidman runs his own blog at savetheapwu.com, which serves as the lead platform for Stidman's  attacks.

**Stidman Crosses the Line With a Defamatory Attack**

17.     Dimondstein has weathered Stidman's disparaging attacks for a long time.  He understands that despite his overwhelming support amongst the members, as President, he will be the subject of vocal criticism by a few of the small percent of members who oppose him.

18.     Thus, uninformed criticisms about Dimondstein policies and accomplishments – Stidman's version of "fake news"-- are met with truthful rebuttals or, frankly, ignored while APWU leadership focus on doing its important work for its members.

19.     Simply, Dimondstein has never had any desire to remove Stidman from his soapbox of propaganda and disinformation.  That is Stidman's First Amendment right, *to a point.*

20.     On or about July 28, 2019, Stidman passed that point – he crossed the line from First Amendment protected speech criticizing Dimondstein to out-and-out libel.

21.     On that date, Stidman made a post on his savetheapwu.com blog.  The headline was "APWU President Mark Dimondstein's historic ties to money laundering." Also included was an image of additional text that said "NEWS" and "Money Laundering!" with a pair of handcuffs lying across them.  Together these are the "Defamatory Statements."

22.     Following the Defamatory Statements, Stidman republished an eight-year-old press release from another organization that did not in any way support the Defamatory Statements.

**Kelley Republishes the Defamatory Statements**

23.     Kelley is another activist union member who has made frequent attacks against Dimondstein.

24.     On or about July 28, 2019, Kelley republished the Defamatory Statements by copying the hyperlink and posting it to the Facebook page for 21st Century Postal Worker, a group that has roughly 3,800 members.

## FIRST CAUSE OF ACTION

### (For Libel – Brought by Dimondstein Against Stidman)

25. Dimondstein incorporates by reference each and every allegation contained in Paragraphs 1-24, above.

26. On or about July 28, 2019, Stidman published the Defamatory Statements.

27. Stidman knew or, in the exercise of reasonable care, should have known that the Defamatory Statements would be republished by others because he knew his blog posts had been reposted on social media in the past.

28. The Defamatory Statements was republished.

29. Reasonable people who read the Defamatory Statements would understand it to state or imply that Dimondstein was involved in illegal financial transactions involving money laundering.

30. The Defamatory Statements is false. Dimondstein has never engaged in or been involved with money laundering.

31. The Defamatory Statements is defamatory *per se* because it accuses Dimondstein of being involved in a crime. It has the natural consequence of doing damage to Dimondstein's business and professional reputation, particularly as the President of a large union who is a candidate for re-election.

32. At the time Stidman made the Defamatory Statements, he knew it was false or he acted with reckless disregard for truth or falsity. The Defamatory Statements was completely made up by him. The *eight- year-old* press release which he included with the Defamatory Statements contained no factual information that would support the Defamatory Statements. Moreover, Stidman knew that in the eight years after the press release was issued, Dimondstein

had never been convicted of, let alone charged with, let alone accused of, any act of money laundering. Nor had any contribution Dimondstein has made to any union been determined to be illegal or otherwise improper.

33. Simply, at the time of publication, Stidman had no reliable information whatsoever on which to base his made-up Defamatory Statements.

34. As a direct and proximate result of the publications of the Defamatory Statements, Dimondstein has suffered injury to his reputation, shame, mortification, and mental anguish to his general damage in an amount to be proven at trial, but not less than $5 million.

35. Stidman's conduct as alleged herein was willful, wanton, and malicious and was done with conscious disregard for Dimondstein's rights. Accordingly, an award of punitive and exemplary damages is appropriate.

## SECOND CAUSE OF ACTION

### (For Libel – Brought by Dimondstein Against Kelley)

36. Dimondstein incorporates by reference each and every allegation contained in Paragraphs 1-35, above.

37. On or about July 28, 2019, Kelley republished the Defamatory Statements on Facebook.

38. Reasonable people who read the Defamatory Statements would understand it to state or imply that Dimondstein was involved in illegal financial transactions involving money laundering.

39. The Defamatory Statements is false. Dimondstein has never engaged in or been involved with money laundering.

40. The Defamatory Statements is defamatory *per se* because it accuses Dimondstein of being involved in a crime. It has the natural consequence of doing damage to Dimondstein's business and professional reputation, particularly as the President of a large union who is a candidate for re-election.

41. At the time Kelley made the Defamatory Statements, he knew it was false or he acted with reckless disregard for truth or falsity. Kelley had *no* information that Dimondstein had engaged in such illegal conduct. The *eight- year-old* press release which was included with the Defamatory Statements (if Kelley read it at all) contained no factual information that would support the Defamatory Statements. Moreover, Kelley knew that in the eight years after the press release was issued, Dimondstein had never been convicted of, let alone charged with, let alone accused of, any act of money laundering. Nor had any contribution Dimondstein has made to any union been determined to be illegal or otherwise improper. Moreover, Kelley knew that Stidman was a political opponent of Dimondstein who made regular attacks on Dimondstein and was not a reliable source.

42. At the time Kelley published the Defamatory Statements, he had no reliable information whatsoever to support the Defamatory Statements.

43. As a direct and proximate result of the publication of the Defamatory Statements, Dimondstein has suffered injury to his reputation, shame, mortification, and mental anguish to his general damage in an amount to be proven at trial, but not less than $5 million.

44. Kelley's conduct as alleged herein was willful, wanton, and malicious and was done with conscious disregard for Dimondstein's rights. Accordingly, an award of punitive and exemplary damages is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against each Defendant as follows:

1. Compensatory damages against each Defendant, jointly and severally, in an amount to be proven at the time of trial, but not less than $5,000,000;

2. Punitive damages against each Defendant in an amount to be proven at trial;

3. Costs of suit incurred by Plaintiff in this matter; and

4. Such further and other relief as the Court might deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts, as to all issues so triable.

DATED:   August 15, 2019                           Respectfully submitted,


/s/ Heidi Burakiewicz
Heidi Burakiewicz
DC Bar No. 473973
Kalijarvi, Chuzi, Newman & Fitch, PC
818 Connecticut Ave., NW  Suite 1000
Washington, D.C.  20006
Tel: (202) 331-9260
Fax: (866) 452-5789
Email: hburakiewicz@kcnlaw.com
Local Counsel for Plaintiff


/s/ Mitchell J. Langberg
Mitchell J. Langberg
NV Bar No. 10118
Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106
Tel: (702) 464-7098
Email:  mlangberg@bhfs.com
Counsel of Record for Plaintiff